**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|   |   |
|---|---|
| **JAMES KELLEY, et al.**<br><br>   **Plaintiffs,**<br><br>      v.<br><br>**JAMES BILLINGTON, Librarian,**<br>**Library of Congress,**<br><br>   **Defendant.** | **Civil Action No. 02-2431 (JDB)** |

**MEMORANDUM OPINION**

In this action, plaintiffs James Kelley and Vanita Kelly assert a discrimination claim against James Billington, Librarian of the Library of Congress ("defendant" or "Library") relating to their employment as police officers at the Library. Plaintiffs bring their claim under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., based on allegations of harassment by their co-workers because of their inter-racial marriage. See Compl. ¶¶ 10-11. Presently before the Court is defendant's motion for summary judgment. For the reasons discussed below, the motion will be granted.

**BACKGROUND**

The following facts are uncontroverted.[1] Plaintiffs are a married couple who both work as

---

[1] Plaintiffs' Statement of Material Facts to Which There is a Genuine Issue ("Pls.' Statement") does not challenge the facts asserted in defendant's Statement of Undisputed Material Facts ("Def. Statement"). In fact, Plaintiffs' Statement contains only a legal conclusion as to whether Lieutenant Dogan implemented appropriate corrective measures to Mrs. Kelley's complaints. Moreover, plaintiffs do not elsewhere contest the facts in Defendant's Statement; rather, they only challenge the legal significance of those facts. Therefore, plaintiffs' failure to

police officers at the Library of Congress ("Library").  See Def. Statement ¶ 1.  The plaintiffs met while they were both employed by the Library in 1994 and were married on July 8, 2000.  Id. ¶ 12.  Mr. Kelly, a Caucasian, began working at the Library in September 1991 as a Police Officer, Private with Training.  Id. ¶¶ 1, 4.  After 30 months, he was promoted to Police Officer, Private First Class.  Id. ¶ 4.  Since 2001, Mr. Kelley has worked the second shift, which is commanded by Lt. Melvin Dogan, an African-American, with Sgt. Jeffrey Milton, a Caucasian, as the second shift patrol sergeant.  Id.  Mr. Kelley has never received an evaluation below "satisfactory."  Id. ¶ 6.

Mrs. Kelley, an African-American, started at the Library in April 1994 as a Police Officer, Private with Training.  Id. ¶¶ 1, 7.  After 30 months, she was promoted to Police Officer, Private First Class.  Id. ¶ 7.  On December 8, 1996, Mrs. Kelley was promoted to the position of Police Technician.  Id.  Then on January 12, 2003, she was again promoted, this time to Sergeant.  Id.  As a technician Mrs. Kelley worked in the Communications Center monitoring alarms and radio dispatches and receiving telephone calls.  Id. ¶ 9.  She worked alongside two other technicians, Deborah Butler, an African-American, and Floyd Montague, an African-American.  Id.  As a sergeant, Mrs. Kelley first worked in the administrative section, but then was moved to the command center where she supervised several technicians, including Ms. Butler.  Id. ¶ 10.  Throughout her career at the Library, Mrs. Kelley has never received a rating below "excellent" and she received performance awards in 1996 and 2003.  Id. ¶ 11.

On the morning of September 20, 2001, Mrs. Kelley found a photocopy of a picture of a

---

controvert the specific material facts in Defendant's Statement means they are deemed conceded. See LCvR 7(h) ("the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion").

man and woman in her Library mailbox.  Id. ¶ 14.  The caption on the photo read, "David J. Eisenhower and Ida Stover Eisenhower (Dwight's parents)."  Id.  Mrs. Kelley did not know what the photo represented, and neither did Mr. Kelley when she showed it to him shortly thereafter.  Id.  Officer Aaron Williams told Mrs. Kelley that the picture was of an African-American woman and a Caucasian male, from which Mrs. Kelley concluded that "someone was making a mockery of [her] marriage."  Id.  Before roll call that morning, Mrs. Kelly took the picture to her supervisor, Lt. Dogan, who announced at roll call (before the entire second shift) that such harassment would not be tolerated.  Id. ¶¶ 15, 17.  After the September 20, 2001 roll call, no further incidents of this type occurred.  Id. ¶ 18.  Following the announcement at roll call, Lt. Dogan directed Sgt. Milton to investigate who placed the picture in Mrs. Kelley's mailbox.  Id. ¶ 19.  Neither officials at the Library nor plaintiffs have ever established who placed the picture in Mrs. Kelley's mailbox.  Id.

On October 4, 2001, plaintiffs filed an informal complaint of discrimination with the Library Equal Employment Opportunity Complaints Officer ("EEOCO").  Id. ¶ 20.  In that informal complaint, and a subsequent supplement, plaintiffs recounted several incidents of alleged harassment they suffered as a result of their inter-racial marriage.  Id.  The EEO counselor was unable to resolve plaintiffs' concerns and informed them that they could file a formal complaint.  Id. ¶ 34.  On June 17, 2002, plaintiffs filed a formal complaint with the EEOCO.  Id.  Between October 4, 2001 and June 17, 2002, plaintiffs did not report any specific incidents of racial harassment.  Id.  On July 31, 2002, the EEOCO informed plaintiffs that their formal complaint would not be accepted for processing because the alleged incidents of harassment "have not been regular or severe enough."  Id. ¶ 35.  Plaintiffs appealed this determination, but on September 13,

2002 the EEOC office at the Library wrote plaintiffs that their appeal was denied and that they had 90 days from receipt of that letter to file suit. See id.; Def. Mot., Ex. K.

In their EEOC complaints, and over the course of discovery in the present action, plaintiffs have cited the following fourteen incidents, along with the photograph, as evidence of an alleged hostile work environment:

1. In 1994, according to Officer Tom Cartledge, Officer James Pettus described Mr. Kelley as a white male thirsting for "brown sugar." Def. Statement ¶ 21. Officers Cartledge and Pettus also stated that all white men wanted "black bed warmers" and that Mr. Kelley would never marry Mrs. Kelley and would probably call her "nigger" one day. Id. Neither plaintiff was present for this conversation. Id.

2. In 1994, Officer Cofield told Mr. Kelley that Officer Ronald Easter did not approve of inter-racial marriages. Id. ¶ 37. Mr. Kelley was not present for that statement, nor did Officer Easter specifically reference Mr. and Mrs. Kelley when he made that comment. Id.

3. In 1997, when Mrs. Kelley returned after break, her radio, playing light rock music, was turned off. Id. ¶ 22. Ms. Butler told Mrs. Kelley she had turned it off because she "did not want to listen to that hillbilly." Id.

4. On January 23, 2000, fellow technician Floyd Montague told Mrs. Kelley that a couple of days earlier Ms. Butler told him, "Damn that are you in love with the white boy, too? I know your friend is!" Id. ¶ 23. Mrs. Kelley believes the white boy referred to was Mr. Kelley, although she was not present for the remarks. Id.

5. On January 25, 2000, during an emergency shutdown Ms. Butler said, "Put your leave slips in if you want to go home. It's going to be by seniority so that means all the black people have to stay." Id. ¶ 24. Lt. Dogan, Mrs. Kelley and others were present when Ms. Butler, who does not have authority to issue leave, made this statement. Id. The statement was not made directly to Mrs. Kelley, but instead was addressed to all those present. Id.

6. At some point "in the past" Mrs. Kelley heard Ms. Butler say, "this is the black side (referring to the Jefferson and Adams Buildings) and the Madison is the white side. The Madison gets everything." Id. ¶ 25. Mr. Kelley was not present when this statement was made. Id.

7. At some point "in the past" Mrs. Kelley overhead Ms. Butler say on the phone that the wedding Ms. Butler had attended with a white officiant was "really nice." Id. ¶

      26. This comment was not directed towards Mrs. Kelley, and Mrs. Kelley has acknowledged the comment has nothing to do with her marriage. Id.

8. On March 6, 2000, Mr. Montague told Mrs. Kelley that Ms. Butler, in a previous conversation regarding the Fraternal Order of Police Union Contract, had remarked, "white boys putting their heads together." Id. ¶ 29. Plaintiffs believe that the "white boys" referred to Mr. Kelley and Officer Vernon Gehris, although neither plaintiff was present for the remark. Id. On three different occasions, Mrs. Kelley spoke to Lt. Dogan about Ms. Butler's comments. Id. ¶ 27. Mrs. Kelley is aware that Lt. Dogan spoke to Ms. Butler at least twice regarding Mrs. Kelley's complaints. Id.

9. In December 2000, Officer Fields informed Mr. Kelley that Officer Pettus had told him that Mr. Kelley studied the teachings of Hitler, that Mr. Kelley believed that Hitler was a brilliant man, and that Mr. Kelley was a Nazi sympathizer. Id. ¶ 30. Mr. Kelley was not present for this statement. Id. Mr. Kelley complained to Lt. Dogan about the comments of Officer Pettus. Id. ¶ 32. Lt. Dogan discussed the issue with Officer Pettus. Id.

10. On December 29, 2000, prior to roll call, Mrs. Kelley heard Ms. Butler say to Officer Gehris, "Hey Gehris, hey Gehris say something about me so that I can take you to the sixth floor." Id. ¶ 33. Mrs. Kelley overhead this comment, although it was not addressed to her and she does not know what the statement was about. Id.

11. At an undisclosed time, Sergeant Robert Gross told Mrs. Kelley that he thought Ms. Butler did not like Mrs. Kelley because she disproved of Mrs. Kelley's inter-racial marriage. Id. ¶ 36.

12. Lily Wheeler, the time and attendance clerk, told Mrs. Kelley that Ms. Butler is "evil" and did not like Mrs. Kelley because of Mrs. Kelley's marriage. Id.

13. In 2001, Officer Wagner told Mr. Kelley that he overheard Officer Howard Moore comment to another officer that: "They're spreading their seed, they're making sure that their bloodlines continue and ours get polluted. So what we need to do as black males is inseminate some white females." Id. ¶ 37. Mr. Kelley understood that Officer Moore did not identify the "they" that he was referring to, nor did he specifically reference the Kelleys. Id. Mr. Kelley was not present when this statement was made. Id.

14. Officer Julie Johnson told Mr. Kelley that she heard rumors that he was a Nazi sympathizer, but that she did not believe those rumors herself. Id.

As a result of this alleged harassment, Mrs. Kelley suffered chest pain, numbness in her

arms, upset stomachs, and headaches. Id. ¶ 41. On one occasion she was rushed from the Library to the George Washington Hospital suffering from a bout of high blood pressure. See Pl. Opp., Ex. 3, Affidavit of Vanita Kelley ("Mrs. Kelley Affidavit"). As a result of the alleged harassment, Mrs. Kelley was also required to use sick leave at work. Id. Mr. Kelley has not suffered any physical injuries as a result of the alleged harassment. See Def. Statement ¶ 42.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Fed.R.Civ.P. 56(c)).

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. Celotex, 477 U.S. at 322. "If the evidence is merely colorable, or is not significantly

probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

## ANALYSIS

Plaintiffs allege that over the course of their relationship, from 1994 to 2001, they have been subjected to harassment from their co-workers on account of their inter-racial marriage. See Compl. ¶ 4. Over a seven-year period, plaintiffs allege that co-workers made disparaging comments about their marriage and subjected them to frequent harassment. Plaintiffs have cited a total of fifteen specific incidents of harassment, described above, that form the basis of their hostile work environment claim. Most of these incidents were verbal comments made by co-workers either to plaintiffs or to other co-workers at the Library.[2]

To establish a prima facie hostile work environment claim, the Kelleys must demonstrate that: (1) they are members of a protected class; (2) they were subject to unwelcome harassment; (3) the harassment occurred because of their race; (4) the harassment affected a term, condition or privilege of employment; and (5) the employer knew or should have known of the harassment, but failed to take any action to prevent it. See Jones v. Billington, 12 F. Supp. 2d 1, 11 (D.D.C.

---

[2] Plaintiffs also state in their opposition to defendant's motion for summary judgment that: (1) Mrs. Kelley was "harassed on a daily basis by a co-worker," (2) Mrs. Kelley "beginning in 1997 . . . repeatedly complained to Lieutenant Dogan about Ms. Butler's behavior and racial comments, but he took no action against Ms. Butler and the harassment continued for years," and (3) that Ms. Butler "humiliated Mrs. Kelley" on the police radio. See Pl. Opp. at 2-4. Plaintiffs, however, provide no additional facts to support these general allegations. Such conclusory allegations, not supported by evidence in the record, will not be credited by the Court as independent facts, or as sufficient to create a genuine issue in dispute. See Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999) (conclusory allegations are insufficient to survive summary judgment, and crediting them would defeat the purpose of summary judgment).

1997), aff'd, 1998 WL 389101 (D.C. Cir. June 30, 1998).  The workplace environment becomes "hostile" for purposes of Title VII only when the offensive conduct "permeate[s] [the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998); accord Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993); see also Pa. State Police v. Suders, 124 S.Ct. 2342, 2347 (2004); Clark County School District v. Breeden, 532 U.S. 268, 270-271 (2001); Holbrook v. Reno, 196 F.3d 255, 262 (D.C. Cir. 1999).

The key terms, then, are "severe," "pervasive," and "abusive," as not just any offensive or discriminatory conduct constitutes an actionable hostile work environment.  Under Faragher v. Boca Raton, 524 U.S. 775, 787-88 (1998), in order to determine whether a work environment is sufficiently hostile to be actionable under Title VII, a court should consider: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or merely offensive; and (4) whether the conduct reasonably interferes with the employee's performance.

> These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a "general civility code."  Properly applied, this will filter out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."

Id. at 787 (citations omitted).  Moreover, it must be clear that the hostile work environment was the result of discrimination based on a protected status.  As the Second Circuit has explained:

> Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude.  It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage of correlation to the claimed ground of discrimination.

Otherwise, the federal courts will become a court of personnel appeals.

Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002). Thus "to sustain a hostile work environment claim . . . [plaintiff] must produce evidence that she was discriminated against because of her [status]." Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 440 (2d Cir. 1999) (claim for hostile work environment failed where only three of fifteen alleged incidents had racial overtones); see also Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 345-46 (7th Cir. 1999) (hostile work environment claim failed where insufficient evidence that alleged harassing behavior was motivated by discrimination); Jones v. Billington, 12 F. Supp.2d at 12 (hostile work environment claim failed where plaintiff had "not demonstrated that any of the conduct of which he complains was related to his race, or that his workplace was permeated with racially discriminatory behavior").

Plaintiffs' allegations fall well short of establishing a hostile work environment under this exacting standard. Considering the totality of the evidence proffered, it is clear that defendant is entitled to summary judgment. Drawing all inferences in favor of plaintiffs, there are no genuine issues of material fact, and no reasonable jury could find, on the evidence in the record, that plaintiffs have established a hostile work environment claim. The sum total of the allegations reveals that: (1) many of the alleged incidents were not related to plaintiffs' protected status and therefore were not racial harassment; (2) most of the comments were not directed at plaintiffs; (3) the comments were infrequent; (4) plaintiffs' supervisors were not involved in any of the alleged harassment; and (5) plaintiffs were never threatened by the harassment.[3] These factors establish

---

[3] Defendant observes that much of the evidence offered by plaintiffs is inadmissible hearsay. See Def. Mot. 7-10. To defeat a motion for summary judgment, the nonmovant is not

that plaintiffs cannot meet the high burden of showing hostility in the work environment at the Library that was "severe," "pervasive," and "abusive."

First and foremost, many of the incidents of harassment[4] cited by plaintiffs are not related to their race, and therefore cannot be used to support a hostile work environment claim. See Burton v. Batista, 339 F. Supp. 2d 97, 107 (D.D.C. 2004). The two comments that Mr. Kelley was a Nazi sympathizer, Ms. Butler's comments about the wedding with a white officiant being "nice," Ms. Butler calling Mrs. Kelley's music "hillbilly," and Ms. Butler's statement to Officer Gehris about the "sixth floor" have nothing at all to do with plaintiffs' race.[5] Because these five incidents cannot be construed as involving plaintiffs' race, they cannot support plaintiffs' hostile

---

required to present evidence in a form admissible at trial, but the evidence must be capable of being converted into evidence admissible at trial. See Gleklen v. Democratic Cong. Campaign Comm., Inc., 199 F.3d 1365, 1369 (D.C. Cir. 2000) ("[P]laintiff's evidence about the conversation is sheer hearsay; she would not be permitted to testify about the conversation at trial. . . It therefore counts for nothing."); see also Commercial Drapery Contractors, Inc. v. United States, 133 F.3d 1, 7 (D.C. Cir. 1998) ("An affidavit like this, consisting entirely of inadmissible hearsay, is not sufficient to defeat summary judgment."); Wilson v. Dana Corp., 210 F.Supp.2d 867, 873 (W.D.Ky. 2002) (on a motion for summary judgment in a hostile work environment case, "hearsay . . . will not be considered by the court").

In this case, of the fifteen specific incidents of harassment cited by plaintiffs, seven occurred outside their presence, and the only evidence for those incidents consists of plaintiffs' testimony as to what other people told them, which is quintessential hearsay. See Fed.R.Evid. 801(c). The Court is well within its purview to disregard this evidence, see Gleken, 199 F.3d at 1369, but need not take such a step because, even considering all the proffered incidents of harassment, plaintiffs do not have an actionable hostile work environment claim.

[4] As a threshold matter, two of the alleged "incidents" are not harassment at all. When Sgt. Gross and Ms. Wheeler each told Mrs. Kelley that Ms. Butler did not like her because of her inter-racial marriage, they were merely conveying someone's opinions. Those two statements are not themselves harassment, and therefore cannot support a claim of a hostile work environment.

[5] On this last incident, even Mrs. Kelley does not know what Ms. Butler meant. See Def. Statement ¶ 33.

work environment claim.  See Lester v. Natsios, 290 F.Supp.2d 11, 31-32 (D.D.C. 2003) (disregarding two incidents in a hostile work environment claim that did not have a racial element).

Moreover, some of the other incidents cited by plaintiffs, while on their face appearing racial, considered in context are not.  Ms. Butler's January 2000 statement during the emergency shutdown ("Put your leave slips in if you want to go home.  It's going to be by seniority so that means all the black people have to stay.") is not clearly racial harassment.  It was not directed towards plaintiffs, or about plaintiffs, but rather was made by an African-American woman to a group of people.  It may simply be a statement regarding the racial composition and seniority of the workforce at the Library -- but at the very least it cannot be construed as racially harassing towards plaintiffs.  Cf. Bryant v. Brownlee, 265 F.Supp. 2d 52, 65 (D.D.C. 2003) (debatable whether statement "black women were at the bottom.  The white men were first . . ." was racially harassing).  The same consideration applies to Ms. Butler's statement that "this is the black side . . . and the Madison is the white side.  The Madison gets everything."  Far from being racially harassing, such a statement by an African-American would seem to be lamenting racial inequalities, not creating a hostile work environment for plaintiffs.  This is especially true where the statement was made to a group, including Mrs. Kelley, all of whom the record would indicate are themselves African-Americans.

Another important factor in assessing whether harassment was sufficiently "severe," "pervasive" and "abusive" is whether the incidents of harassment are directed at others, rather than at plaintiffs.  When the alleged harassment is directed at others it is considered less hostile.  See Lester, 290 F. Supp. 2d at 31 ("Conduct directed at others rather than at plaintiff . . . is less

indicative of a hostile work environment." (citing Gleason v. Mesirow Fin'l Inc., 118 F.3d 1134, 1144 (7th Cir.1997) ("the impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff")).  In the present action, of the six incidents that bare some relation to plaintiffs' protected status, only one was directed specifically at them -- the placement of the photograph in Mrs. Kelley's mailbox.

It is clear that other incidents involved statements made by third parties to third parties, and as such are less indicative of a hostile work environment.  See Lester, 290 F. Supp. 2d at 31. Moreover, these incidents do not come close to the level of a "severe," "pervasive" and "abusive" environment, either individually or collectively.  Ms. Butler's comment about the "white boys" putting their heads together and a co-worker loving the "white boys" are not facially offensive. See Faragher, 524 U.S. at 787-88.  Although Mrs. Kelley may find it offensive when Ms. Butler uses the term "white boy," these comments were not directed to Mrs. Kelley or to her husband, and are more akin to an "offhand comment."  See Manatt v. Bank of America NA, 339 F.3d 792, 798 (9th Cir. 2003) (statements such as "China man" made directly to Asian-American plaintiff were classified as "simple teasing" or "offhand comments").  In another incident, a co-worker merely stated to someone other than plaintiffs his opinion that he disapproved of inter-racial marriages.  This statement was made in 1994, six years before plaintiffs were married, and Mrs. Kelley understands that this individual was not referencing her specifically.  See Def. Statement ¶ 37. Moreover, someone's opinion about inter-racial marriage, made six years before plaintiffs themselves were married, and not made directly to plaintiffs, cannot reasonably be considered offensive.

The final two incidents -- 1994 comments by Officer Cartledge and Pettus that Mr. Kelley

was looking for "brown sugar" and a 2001 statement by Officer Moore that "they're spreading their seed" -- do involve disparaging remarks about plaintiffs.  However, these remarks were not made to plaintiffs, nor does it seem they were ever intended for plaintiffs.  See Gleason, 118 F.3d at 1144 ("the impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff").  The comments were also separated by seven years -- 1994 to 2001 -- and the intermittent nature of these incidents suggests the lack of a setting sufficiently pervasive to constitute a hostile work environment.  See Hopkins, 77 F.3d at 753 (alleged incidents over a seven-year period suggests the absence of a pervasive condition).  Finally, these statements were not made by a supervisor, and in no way physically threatened either plaintiff.  See Faragher, 524 U.S. at 787-88 (factor in assessing hostility of work environment is whether plaintiff physically threatened).

   The only incident of racial harassment actually directed at plaintiffs was the photograph left in Mrs. Kelley's mailbox.  This incident by itself was not particularly offensive.  When plaintiffs first discovered the photograph, they were not even sure what it meant.  See Def. Statement ¶ 14.  Nor is it obvious that the picture is of an inter-racial couple.  Id. ¶ 15.  Moreover, objectively, the picture, while perhaps inappropriate, was not severe or abusive.  Plaintiffs' initial confusion highlights the nature of this incident.  The picture did not threaten or insult plaintiffs, there is no evidence it was given to them by a supervisor, there was no derogatory note with the picture, and in fact there is no objective basis to find the picture was intended to be a negative comment.  Cf. Woodland v. Joseph T. Ryerson & Son, Inc., 302 F.3d 839, 844 (8th Cir. 2002) (no severe or pervasive hostile work environment when, inter alia, plaintiff exposed to racial poems, drawing of "KKK," swastika, and a hooded figure on the bathroom wall).

Importantly, after this incident, plaintiff reported no more incidents of alleged racial harassment directed at them. See Def. Statement ¶ 18. When plaintiffs reported the incident to Lt. Dogan, he spoke to the entire second shift, warning them such conduct would not be tolerated. Id. ¶ 17; see also Woodland, 302 F.3d at 844 (prompt response by supervisors in destroying racist graffiti a factor in finding materials did not amount to a severe or pervasive hostile work environment). There is some conflicting evidence regarding the conduct of the investigation, but there is no doubt that after the admonishment by Lt. Dogan there were no further incidents. Id. ¶ 18. Therefore, not only was the photograph the only incident of true racial harassment directed at plaintiffs, it was also the last incident of harassment. See, e.g.,, Freedman v. MCI Telecommunications Corp., 255 F.3d 840, 848-49 (D.C. Cir.2001) (single anti-Semitic comment did not support finding hostile environment under Title VII); Breeden, 532 U.S. at 270-71 (reiterating that harassment must be "pervasive" to constitute a hostile work environment, and isolated incidents usually do not rise to an actionable level).

Reviewing the totality of the circumstances, including the frequency, nature, severity and the offensiveness of the alleged incidents, they do not meet the threshold of severe, pervasive and abusive discriminatory conduct. Many of the alleged incidents did not involve racially discriminatory conduct directed at plaintiffs. Moreover, the majority of the incidents occurred outside the presence of plaintiffs. Ultimately, only one incident -- the photograph-- was directed at plaintiffs and arguably related to their protected status. Plainly, Mrs. Kelley has a tumultuous relationship with Ms. Butler, and finds Ms. Butler's comments rude and inappropriate. But the Supreme Court has stressed that Title VII should not become a "general civility code," Faragher, 524 U.S. at 788 (quoting Oncale, 523 U.S. at 80), and the totality of the circumstances here does

not establish racial harassment as a matter of law.  Other courts have deemed circumstances that were much worse than this not to qualify as racial harassment.  See <u>Bryant</u>, 265 F.Supp.2d at 64 (no hostile work environment when co-worker referred to plaintiff as "nigger" and another co-worker said "black woman were at the bottom. The white men were first, the white women were right up there with them . . ."); <u>Skipper v. Giant Food, Inc.</u>, 68 Fed.Appx 393, 399 (4th Cir. 2003) (no racially hostile work environment where plaintiff exposed to daily racist graffiti, overheard white co-workers using racial slurs 13 times over four years, and referred to by manager with a racial slur).

## **CONCLUSION**

For the reasons stated above, defendant's motion for summary judgment is granted.  A separate order has been issued.

                                                  /s/ John D. Bates
                                                  JOHN D. BATES
                                          United States District Judge

Dated:    March 31, 2005

Copies to:

Bryan A. Chapman
601 Pennsylvania Avenue, NW
Suite 900
Washington, DC 20004

Stratton Strand
United States Attorney's
Office
Judiciary Center Building
10th Floor
555 Fourth Street, NW
Washington, DC 20001